UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Lance Phillip Wickner,

    Plaintiff,

v.

Jessica Symmes, Kent Grandlienard,
and Lcie Stevenson, all sued in their
individual and official capacities,

    Defendants.

Civ. No. 09-940 (DWF/JJK)

**REPORT AND RECOMMENDATION**

Lance Phillip Wickner, #204147, MCF-Oak Park Heights, 5329 Osgood Avenue North, Stillwater, MN 55082-1117, *pro se*.

Jackson Evans, Minnesota Attorney General's Office, counsel for Defendants.

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment (Doc. No. 56), Plaintiff's Motion for the Appointment of Counsel (Doc. No. 60), and Defendants Grandlienard, Symmes, and Stevenson's Motion for Summary Judgment (Doc. No. 61). The case has been referred to this Court for Report and Recommendation under 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons discussed below, this Court recommends that Defendants' motion be granted and Plaintiff's motions be denied.

## BACKGROUND

Plaintiff has been incarcerated at the Minnesota state prison at Oak Park Heights since 2001, serving a sentence of 116 months for vehicular homicide and 13 months for escape. (Doc. No. 54, Third Am. Compl. ¶¶ 41, 42.) The undisputed record shows that Plaintiff has had an extensive history of disciplinary offenses while serving this sentence. (Doc. No. 63, Affidavit of Ricardo Lopez ("Lopez Aff.") ¶ 4, Ex. B.) Plaintiff has often, despite the imposition of disciplinary sanctions, exposed himself to, and masturbated in view of, female prison guards. (*Id.* at Exs. B-C.) Each time Plaintiff engaged in such offensive behavior he was given a term of confinement in disciplinary segregation after notice and hearing. He has accumulated so many of these terms of confinement in segregation that he has been in one of the segregation units continuously from July 30, 2007, to the present. (*Id.* at Ex. D.) This has resulted from the fact that he has continued to commit disciplinary violations even while being housed in segregation. (*Id.* at Ex. B.)

This case arises out of two complaints that Plaintiff has about the prison's practices in disciplinary segregation. First, Plaintiff complains about the fact that inmates in disciplinary segregation do not have the same access to magazines, newspapers, books, photographs, or other publications as inmates in the general population. In general population, inmates may subscribe to newspapers, magazines, books, or other publications of their choosing so long as the publication is not sexually explicit, does not contain hate speech, or violate the

contraband policy. While in disciplinary segregation, however, inmates are only allowed to have one book from a segregation book cart at a time (the cart is comprised mostly of "western novels and contemporary fictions"), up to six inches high of personal mail, and five pounds of legal mail. (Doc. No. 64, Affidavit of Mary McComb ("McComb Aff.") ¶ 4, Ex. C; ¶ 13.) Inmates in disciplinary segregation are also only allowed to receive subscribed publications that are either legal or legislative. (*Id.* ¶ 6.) The legal publications are those that pertain to criminal or civil-rights law and contain articles on relevant court decisions or tips on legal research or drafting legal documents, such as *Prison Legal News*, state bar publications, and publications of prisoner-rights organizations which summarize recent court decisions. (*Id.* ¶ 10-11.) The legislative publications are those published by a legislative body that can enact legislation that is relevant to an inmate's criminal conviction or the conditions of his confinement, such as *Session Weekly* published by the Minnesota Legislature. (*Id.* ¶ 7-9.) But inmates in disciplinary segregation do not have the same general privilege to receive newspapers, magazines, books, or other publications that would be entertaining, educational, or of general interest to the inmate as a member of the general prison population. If an inmate in disciplinary segregation does receive any such unapproved publication, it is placed in storage for him until he finishes his term of disciplinary segregation. (*Id.* ¶ 6.) Plaintiff contends that this practice violates his First Amendment right to freedom of speech. He seeks declaratory and injunctive relief that would require the

prison to treat inmates in disciplinary segregation the same as those in the general population insofar as the receipt of printed publications is concerned and also seeks damages for the alleged violation of his constitutional rights by the individual prison officials who are Defendants in this matter.[1]

Plaintiff's second complaint relates to the fact that in April 2009, he was transferred from one unit known as Complex-5 to a different segregation unit, the Administrative Control Unit ("ACU").  Although both Complex-5 and ACU are segregation units in which inmates live in segregated cells, inmates in Complex-5 have more contact with other inmates in segregation because they are given an opportunity to recreate with each other during their recreation time.  (Doc. No. 65, Affidavit of Lcie Stevenson ("Stevenson Aff.") ¶¶ 3, 4.)  Inmates in the ACU have the same amount of recreation time as those in Complex-5 but they must recreate by themselves.  (*Id.* ¶ 3.)  This is due to the fact that inmates in ACU are those who have a long period of time remaining on a lengthy segregation term or have committed a violent act.  (*Id.*)  Toward the end of their segregation sentence, inmates are transferred from ACU to Complex-5; then when inmates have approximately two weeks remaining on their segregation term, they are

---

[1] In a declaration filed in support of his partial motion for summary judgment, Plaintiff appears to be arguing that some specific publications denied to inmates in disciplinary segregation are, in fact, legal publications. (Doc. No. 59, Declaration in Support of Plaintiff's Motion for Partial Summary Judgment ("Wickner Aff.") ¶ 5-6.)  This Court, however, will not address that issue here because it is not encompassed within the claims as plead in Plaintiff's Complaint. Instead, the issue before the Court is whether Plaintiff should have the same unfettered right to subscribe or order newspapers, periodicals, books, and other publications as general population inmates.

transferred from Complex-5 to Complex-1, which is known as the "Separate Housing Unit," where they have the opportunity for greater inmate interaction to help them transition back into the general population. (*Id.* ¶ 5.)

By the end of April 2009, Plaintiff had amassed such a long term of disciplinary segregation as a result of his numerous, continuous disciplinary offenses that he is not going to be eligible for release back into the general population prior to his release from custody by the Minnesota Department of Corrections. (*Id.* ¶ 6.) Based on that fact, the prison officials decided that the cell Plaintiff was using in Complex-5 would be better utilized by an inmate in the step-down process transitioning back to the general population from the ACU. (*Id.* ¶ 8.) Plaintiff contends that his transfer from Complex-5 (where he was in disciplinary segregation prior to April 2009), to ACU was a major change in his conditions of confinement and the transfer violated the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States because it was done without notice, hearing, or review. Plaintiff seeks declaratory and injunctive relief to require Defendants to transfer him to Complex-5, as well as damages for the alleged constitutional violation.

## DISCUSSION

**I.     Standard of Review**

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence, and the inferences that may be

reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II. Analysis

### A. Plaintiff's First Amendment Claim

The First Amendment right to retain newspapers, magazines, and other publications can be reasonably restricted so that the right is considerably less for inmates in disciplinary segregation than the rights of inmates in the general population. *See Beard v. Banks*, 548 U.S. 521, 528-29 (2006) ("[T]he

Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere."). An inmate retains only those "First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Incarceration requires that "many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner." *Overton v. Bazzetta*, 123 U.S. 126, 131 (2003); *see also O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, (1987). Prison officials are allowed to impose "curtailments of that freedom." *Overton*, 123 U.S. at 131. Those curtailments are valid provided the regulation bears a "rational relationship to legitimate penological interests." *Id.* at 132 (citing *Turner v. Safley,* 482 U.S. 78, 89 (1987)).

In *Turner v. Safely*, the Supreme Court set forth the following four factors "relevant in determining the reasonableness of the regulations at issue": (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward that would justify the regulation; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact the accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are ready alternatives for furthering the governmental interest available. 482 U.S. at 89-90. Prison officials do not have to meet all four or even a majority of these *Turner* factors to defend a prison policy. *See Beard*, 548 U.S. at 532-33 (stating that the

7

second, third, and fourth factors added little to the first factor's basic logical rationale). They are simply factors that assist in determining the ultimate issue of whether the prison official can demonstrate that a restrictive prison regulation is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 87.

This is particularly important because, as the Supreme Court noted in *Beard* when it dealt with the First Amendment issues involved in the denial of the privilege of reading material to inmates in isolated segregation, the second, third, and fourth *Turner* factors "add little" in assisting a court in analyzing whether a prison regulation—such as the one here that seeks to modify behavior through privilege deprivation—meets the reasonable-relationship test. A deprivation of a privilege, such as the right to entertaining reading material, by design usually does not provide an alternative means for the inmate to exercise the deprived right (step two of *Turner* factors).[2] And when the valid penological objective is encouraging good behavior (for example, not exposing oneself before female guards), or face losing important privileges in segregation, it makes little sense to

---

[2] The Court notes, however, that inmates in disciplinary segregation at Oak Park Heights do have alternative means of expression. They are allowed a broad range of legal publications containing articles or relevant court decisions or tips on legal research or drafting documents, such as *Prisoner Legal News*, state bar publications, and publications of prisoner rights organizations. Also, legislative publications are allowed such as *Session Weekly*. Inmates in disciplinary segregation can check out books from the prison library cart, which include, typically, westerns and contemporary fiction. If an inmate in disciplinary segregation has a subscription to any publications not permitted in disciplinary segregation, then those materials are held and returned to him when he leaves disciplinary segregation. All inmates in disciplinary segregation are also eligible, depending on good behavior in disciplinary segregation, to have an in-cell radio.

inquire into "the impact accommodation of the asserted constitutional right will have on guards and other inmates" (step three) and on allocation of prison resources generally or the availability of "ready alternatives" (step four), because it is inherent that accommodating or providing ready alternatives would produce worse behavior.

This Court concludes that the prison's policy in issue—restricting newspapers, magazines, and other publications to those inmates in disciplinary segregation—is, per *Turner*'s first factor, reasonably related to a legitimate penological interest. The Minnesota Department of Corrections ("DOC") has supported its motion for summary judgment by explaining the sound reasoning behind its policy. Mary McComb, the Associate Warden with the Minnesota DOC at its facility at Oak Park Heights, explains that violations of prison discipline regulations pose danger to the staff and inmates because they often involve violence, possession of contraband, or, as was the case here, abusive behavior toward staff. (McComb Aff. ¶ 12.) She asserts that the prospect of spending time in disciplinary segregation, where privileges are significantly curtailed, should deter the violations, and specifically here, the policy to restrict possession of publications to an inmate in disciplinary segregation does encourage the inmates not to violate disciplinary regulations. (*Id.*) She concludes that "[i]f inmates could read entertaining newspapers and magazines of their choice [in disciplinary segregation] it would be too much like leisure time, and it would not deter future violations." (*Id.*) This is because some inmates might very well

9

prefer to be alone, away from the general population, where they would not have to work a job or deal with other inmates and instead could spend their time alone with entertaining reading of their choice. (*Id.*) Therefore, by not restricting the possession of publications to inmates in disciplinary segregation, it could, in the judgment of prison officials, cut against the goal of reducing violations of disciplinary regulations.[3]

As stated above, Plaintiff's demand in this case is that he have the same unfettered access to his inmate's choice of magazines, newspapers, books, and publications as members of the general prison population. But this Court agrees with Defendants that this would contradict the legitimate objectives of (1) using disciplinary segregation (which of course must entail a significant loss of privilege in order to be disciplinary segregation) to deter unruly behavior, and (2) allowing for the prison authorities to maintain order and security in the prison. Considering both the important First Amendment values involved in a person's access to desired reading material and the considerable deference owed to the prison administrators' determinations about prison security and control, this Court concludes that the disciplinary-segregation regulation in issue is a restriction that is reasonably related to a legitimate penological interest. *See Beard*, 548 U.S. at 530 (finding summary judgment warranted and dismissing First Amendment

---

[3] Defendants also suggest a second reason for the restriction – that it reduces the risk that inmates in disciplinary segregation will use the paper to start fires, clog plumbing, or hide contraband. (*Id.*) As the Supreme Court did in *Beard*, we do not need to reach this rationale because the primary rationale offered here—deterrence—satisfies the test.

claim based on the state prison's denial of all access to newspapers, magazines, and photographs to inmates housed in a long-term segregation unit). Accordingly, Plaintiff's First Amendment claim should be dismissed.

### B. Plaintiff's Due Process Claim

Plaintiff alleges that his right to procedural due process was violated when he did not receive a hearing prior to his transfer from Complex-5 to ACU. He asserts that he would have wanted to challenge what disciplinary-segregation unit he should be housed in at that hearing. Specifically, he complains that in ACU he is no longer able to recreate in person with other inmates, nor can he easily call out to other inmates in nearby cells. Plaintiff does not dispute, however, that on each occasion when Plaintiff committed a disciplinary violation that resulted in a disciplinary-segregation term he had notice and an opportunity for a hearing, as well as an appeal.

To establish Plaintiff's procedural due-process claim, he must demonstrate (1) the deprivation of a protected liberty interest, and (2) lack of procedures to protect that interest. *Board of Regents v. Roth*, 408 U.S. 564, 570-71 (1972). If a claimant cannot establish that he has been deprived of constitutionally protected interest, there is no need to consider whether he received due process. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("We need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest."). There may be an interest protected by the Due Process Clause under certain circumstances in the prison context, but that interest is generally

11

limited to freedom from restraint that imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 485, (1995) (holding that the inmate's confinement in disciplinary segregation "did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest"). In *Moorman v. Thalacker*, the Eighth Circuit interpreted *Sandin* to mean that prisoners' due process rights are implicated only when there have been "deprivations which work such major disruptions in a prisoner's environment and life that they present dramatic departures from the basic conditions and ordinary incidents of prison sentences." 83 F.3d 970, 972 (8th Cir. 1996).

This Court has recently determined that an inmate was not deprived of a liberty interest by his being placed in administrative segregation rather than in the general population of the Minnesota Correctional Facility at Oak Park Heights, Minnesota. *Crow v. Fabian*, No. 08-CV-3350 (PJS/FLN), 2010 WL 2301006, at *2 (D. Minn. June 4, 2010) (adopting Judge Noel's Report and Recommendation at Docket No. 98). In *Crow*, the inmate was held in administrative segregation for approximately one year pending his transfer to another facility. *Crow v. Fabian*, No. 08-CV-3350 (PJS/FLN), Docket No. 98, Report and Recommendation at 4. That inmate's placement was not because the inmate committed disciplinary violations, rather the DOC simply placed him into administrative segregation pursuant to a DOC policy that provides that a prisoner will be placed into administrative segregation if he is being held pending a transfer to another

facility. *Id.* The Court found the inmate was not deprived of a constitutionally protected liberty interest despite the fact that he was kept in segregated confinement, deprived of his ability to take part in Native American ceremonies, and prevented from having contact visitation, because the inmate was unable to satisfy *Sandin*'s "atypical and significant hardship" standard. *Id.* at 14-18.

Similarly here, Plaintiff has not shown that he suffered an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Prisoners are commonly removed from the general prison population for a variety of reasons, and a prisoner who is placed in segregated confinement normally does not suffer the type of "significant hardship" that implicates a constitutionally protected liberty interest. *See Portley-El v. Brill*, 288 F.3d 1063, 1065 (8th Cir. 2002) ("We have consistently held that administrative and disciplinary segregation are not atypical and significant hardships under *Sandin*."). Segregated confinement does not give rise to a protected liberty interest, unless there is something particularly unusual and pernicious about the nature of such confinement. *See Moorman*, 83 F.3d at 972 (stating that prisoner due-process rights are implicated only when there have been "deprivations which work such major disruptions in a prisoner's environment and life that they present dramatic departures from the basic conditions and ordinary incidents of prison sentences"). No longer being able to recreate with other inmates or talk to other inmates in nearby cells do not meet these standards. Therefore, this Court concludes, as a matter of law, that Plaintiff is unable to sustain his due-process

13

claim because he is unable to satisfy Sandin's "atypical and significant hardship" standard.[4] Accordingly, this Court recommends that Plaintiff's due-process claim should be dismissed.

### III.     Plaintiff's Motion for Appointment of Counsel

On May 25, 2010, Plaintiff filed a Motion for the Appointment of Counsel (Doc. No. 60). Plaintiff thereby asks this Court to appoint counsel to represent him in this case because he cannot afford to retain counsel himself, is in a maximum-security prison, is housed in administrative segregation for disciplinary violations, has demanded a jury trial, and because the parties and this Court would substantially benefit from the appointment of counsel.

*Pro se* litigants do not have a constitutional or statutory right to counsel in civil cases. *Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998). Rather, the appointment of counsel is a matter of the court's discretion. *Mosby v. Mabry*, 697 F.2d 213, 214 (8th Cir. 1982); *see also* 28 U.S.C. § 1915(e)(1) (stating that the court may "request an attorney to represent any person unable to afford counsel"). The standard for appointment of counsel in such cases is whether both petitioner and the court would substantially benefit from the assistance of counsel. *Johnson v. Williams*, 788 F.2d 1319, 1322 (8th Cir. 1986); *see also Plummer v. Grimes*, 87 F.3d 1032, 1033 (8th Cir. 1996) ("A district court is to

---

[4]     Because this Court concludes that Plaintiff was not deprived of a constitutionally protected liberty interest, the Court does not address whether the prison officials nevertheless provided Plaintiff a sufficient measure of due process.

decide whether the plaintiff and the court will substantially benefit from the appointment of counsel[.]"). Among the factors the court should consider are "the factual complexity of the issues; the ability of an indigent to investigate the facts; the existence of conflicting testimony; the ability of an indigent to present his claim; and the complexity of the legal issues." *Nachtigall v. Class*, 48 F.3d 1076, 1081-82 (8th Cir. 1995).

After reviewing these factors, this Court finds that neither the facts nor the legal issues involved in this care are so complex as to warrant appointment of counsel. Although Plaintiff's lack of legal knowledge may present some disadvantages, in terms of the requisite time and effort that may be attendant to the presentation of his claim, this Court has taken that into account when it allowed Plaintiff the opportunity to amend his Complaint three times. In addition, Plaintiff has articulated his claims and argued his positions quite well, and has been able to communicate effectively with this Court. Therefore, this Court is satisfied that appointment of counsel would not substantially benefit the Court or Plaintiff. Accordingly, this Court recommends that Plaintiff's request be denied.

In addition, this Court recommends that Plaintiff's request be denied because this Court has recommended that Defendants' motion for summary judgment be granted and Plaintiff's motion for summary judgment be denied. Should the District Court disagree with this Court's recommendation and allow some or all of Plaintiff's claims to proceed to trial, Plaintiff and the District Court may substantially benefit from the appointment of counsel at that time.

Therefore, this Court recommends that Plaintiff not be foreclosed from renewing his motion if such circumstances should arise.

## RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 56), be **DENIED**;

2. Plaintiff's Motion for the Appointment of Counsel (Doc. No. 60), be **DENIED**;

3. Defendants Grandlienard, Symmes, and Stevenson's Motion for Summary Judgment (Doc. No. 61), be **GRANTED**; and

4. This case be **DISMISSED WITH PREJUDICE**.

Date: July 22, 2010

                                        *s/ Jeffrey J. Keyes*
                                        JEFFREY J. KEYES
                                        United States Magistrate Judge

Under D. Minn. Loc. R. 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 5, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.